# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MONROE COUNTY HEALTH CARE AUTHORITY d/b/a MONROE COUNTY HOSPITAL, on behalf of itself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, INC., GE HEALTHCARE INC., and DATEX-OHMEDA, INC.,<br><br>*Defendants*. | Civil Action No. 19-cv-10485<br><br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Monroe County Health Care Authority d/b/a/ Monroe County Hospital ("Plaintiff"), by its undersigned attorneys, hereby brings this class action, on behalf of itself and all others similarly situated, for claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, to recover damages and obtain injunctive relief for injuries caused by Defendants General Electric Company and its subsidiaries GE Healthcare Inc. and Datex-Ohmeda, Inc. d/b/a/ GE Medical Systems (collectively, "GE"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of counsel.

## I.     NATURE OF THE ACTION

1.     Plaintiff's claims stem from GE's exclusionary conduct for the purposes of acquiring and maintaining a monopoly in the market for servicing of GE gas anesthesia machines ("Servicing Market").

2.     GE competes with independent service organizations ("ISOs") in providing essential maintenance and servicing of GE gas anesthesia machines to hospitals, clinics, physician groups, and other health care providers who operate the machines. GE is the largest Servicing Market provider in the United States.

3.     In order to compete with GE in the Servicing Market, ISOs must have timely and reliable access to two markets in which GE holds monopoly power: (a) parts, tools, test equipment, service manuals, and specifications required for servicing of GE gas anesthesia machine parts ("Parts Market"); and (b) training necessary for servicing of GE gas anesthesia machines ("Training Market"). Plaintiff and members of the Class benefit from healthy competition between GE and ISOs, as ISOs with access to the necessary GE parts and GE

training have almost always offered maintenance and servicing at a substantially lower price than GE.

4.      Beginning in April 2011 and through the present, GE has implemented policies restricting ISOs' access to the Parts Market and the Training Market, effectively crippling ISOs' ability to offer servicing for GE gas anesthesia machines and compete with GE in the Servicing Market. Absent competition by ISOs, GE has been able to charge supracompetitive prices for servicing of GE gas anesthesia machines to Plaintiff and members of the Class. Plaintiff seeks remedies for GE's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 including damages, costs, fees, and injunctive relief.

5.      GE currently enjoys almost complete monopoly power in the Parts Market and the Training Market, controlling almost 100 percent of both markets. But, prior to 2011, for nearly two decades, GE profitably sold GE parts and GE training courses to competitor ISOs.

6.      In April 2011, GE began its ongoing policy of refusing to sell GE parts directly to ISOs and appointed Alpha Source, Inc. ("Alpha Source") as its exclusive distributor of GE parts to ISOs. Alpha Source did not keep a full inventory of necessary GE parts and charged significantly higher prices for those it did sell to ISOs, thereby increasing ISOs' operating costs and making it more difficult for them to compete with GE in the Servicing Market.

7.      In October 2014, GE began its ongoing policy of denying GE training courses to its ISOs. GE has shut out ISOs from all but one of its training facilities and continuously denies ISOs' applications for enrollment in the one remaining facility. Furthermore, GE has demanded that ISOs seeking to enroll in training courses must undergo a burdensome process that requires them to disclose competitively sensitive information. As a result, ISOs have been effectively denied the necessary training for servicing GE gas anesthesia machines.

8.      GE internal documents state that the purpose of GE's policies was to "slow down," "add cost," and "phase out" its ISO competitors.[1]

9.      Through these policies, GE is using its monopoly power in the Parts Market and Training Market to push ISOs out of the Servicing Market, where it seeks to acquire and maintain monopoly power.

10.      GE has admitted that its changed policies may harm consumers, noting that there was nothing "procompetitive…about [GE] raising prices to one of [consumers'] low-cost providers."[2]

11.      In May 2015, a group of 14 ISOs brought an antitrust suit against GE alleging violations of Section 2 of the Sherman Act based on GE's exclusionary conduct in the relevant markets for GE parts and GE training in order to monopolize the market for servicing GE gas anesthesia machines. *Red Lion Medical Safety Inc. et al v. General Electric Company, Inc. et al.*, No. 2:15-cv-00308 (E.D. Tex.). There, the jury found GE violated Section 2 of the Sherman Act through its exclusionary practices—that is, its refusal to sell GE parts and GE training to ISOs in order to monopolize the market for the servicing of GE gas anesthesia machines. The District Court denied GE's post-trial motions seeking to set aside these findings as to unlawful monopolization. Memorandum and Order (Dkt. No. 247, filed March 30, 2018). The Court ordered a retrial as to the ISOs' lost-profit damages unrelated to the finding of antitrust liability. *Id.*

12.      After judgment is entered following the conclusion of the retrial, GE will be collaterally estopped from contesting identical issues as already adjudicated, including definition

---

[1] Memorandum Opinion and Order, *Red Lion Medical Safety, Inc. v. General Electric Company, et al.*, No. 2:15-cv-00308, at *25 (E.D. Tex., Mar. 30, 2018).

[2] *Id.* at 21.

of the relevant markets, GE's monopoly power in the markets for GE parts and GE training, and GE's violation of Section 2 of the Sherman Act. Plaintiff therefore need only show that it has been materially injured by GE's exclusionary conduct in its business or property by paying supracompetitive, monopoly prices for servicing of GE gas anesthesia machines.

13.     Plaintiff brings this case to recover damages directly and proximately caused by GE's exclusionary conduct for the period beginning at least as early as April 2011 through the present ("Class Period"). Plaintiff also seeks to enjoin GE from engaging in the anticompetitive conduct explained in further detail below and other such necessary and proper relief to restore competition to the market for servicing of GE gas anesthesia machines.

## II.     JURISDICTION AND VENUE

14.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) to recover treble damages and costs of suit, including reasonable attorneys' fees and to secure injunctive relief against Defendants for injuries suffered from Defendants' violation of Section 2 of the Sherman Act (15 U.S.C. § 2). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a).

15.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Damages Class exceeds $5,000,000, and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants.

16.     Venue is proper in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. §1391(b). Defendants resided, transacted business, or had agents, within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as

described in this Complaint, was within the flow of, was intended to, and did have a substantial

effect on, the interstate commerce of the United States, including in this District, and Plaintiff's

claims arises out of Defendants' conduct.

17.     This Court has personal jurisdiction over Defendants. Defendants have transacted

business, maintained substantial contacts, or committed overt acts in furtherance of the illegal

exclusionary conduct throughout the United States, including in this District. Defendants'

exclusionary conduct has been directed at, and has had the intended effect of, causing injury to

persons residing in, located in, or doing business throughout the United States, including in this

District.

## III.     <u>THE PARTIES</u>

18.     Plaintiff Monroe County Health Care Authority d/b/a Monroe County Hospital is

a director purchaser of servicing for GE gas anesthesia machines from GE during the Class

Period. Plaintiff is located at Post Office Box 886, Monroeville, Alabama 36461.

19.     Defendant General Electric Company, Inc. is a New York corporation with a

principal place of business located at 41 Farnsworth Street, Boston, Massachusetts.

20.     Defendant GE Healthcare Inc. is a subsidiary of General Electric Company

incorporated in the state of Delaware with a principal place of business located at 500 W.

Monroe St., Chicago, Illinois.

21.     Defendant Datex-Ohmeda, Inc. d/b/a GE Medical Systems is a subsidiary of

General Electric Company incorporated in the state of Delaware with a principal place of

business located at 3030 Ohmeda Drive, Madison, Wisconsin.

22.     Defendants' actions described in this Complaint are part of, and in furtherance of,

the unlawful conduct alleged below, and were authorized, ordered, or done by Defendants'

various officers, agents, employees, or other representatives while actively engaged in the

management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, or with the actual, apparent, or ostensible authority of Defendants.

## IV.   TRADE AND COMMERCE AFFECTED

23.   GE is in the business of selling servicing of GE gas anesthesia machines.

24.   At all times relevant to this Complaint, GE has sold a substantial amount of servicing of GE gas anesthesia machines in interstate commerce in numerous states around the United States.

25.   GE's conduct has affected a substantial amount of interstate trade and commerce in the United States with respect to the sale of servicing of GE gas anesthesia machines.

## V.   RELEVANT MARKETS

### A.  Market for Parts Necessary for Servicing GE Gas Anesthesia Machines

26.   The Parts Market encompasses the parts, tools, test equipment, service manuals, and specifications necessary to service GE gas anesthesia machines.

27.   Parts necessary for servicing of GE gas anesthesia machines are not interchangeable with those of other brands of gas anesthesia machines. Thus, if the servicing of a GE machine requires replacing a part, it must be replaced by a GE part.

28.   Accordingly, the Parts Market is composed only of GE parts. GE controls nearly 100 percent and enjoys monopoly power in the Parts Market.

29.   The jury in *Red Lion Medical Safety Inc.* heard and found an identical market definition as to the relevant market for GE parts, and this definition was necessary to its decision. When judgment is entered following the retrial on damages, GE will be collaterally estopped from contesting the definition of the Parts Market.

**B.  Market for Training Necessary for Servicing GE Gas Anesthesia Machines**

30.     The Training Market encompasses GE's sale of its training courses necessary for servicing GE gas anesthesia machines.

31.     Due to the unique nature of GE gas anesthesia machines, training for servicing GE gas anesthesia machines is not interchangeable with training for servicing other brands of gas anesthesia machines.

32.     Accordingly, the Training Market is composed only of training for service of GE gas anesthesia machines. GE has nearly 100 percent control of the Training Market.

33.     The jury in *Red Lion Medical Safety Inc.* heard and found an identical market definition as to the relevant market for GE training, and this definition was necessary to its decision. When judgment is entered following the retrial on damages, GE will be collaterally estopped from contesting the definition of the Training Market.

**C.  Product Market for Servicing GE Gas Anesthesia Machines**

34.     The product market at issue is the Servicing Market, which encompasses the sale of servicing for GE gas anesthesia machines. Sellers in this market include GE and ISOs. The market does not include in-house servicing that hospitals and other operators provide on their own machines because those entities do not compete with GE and ISOs to provide service to other hospitals or operators. Due to the high costs and expertise required for in-house servicing, the majority of hospitals and other operators purchase servicing from GE or ISOs.

35.     GE gas anesthesia machines are very durable and have a life span of ten to fifteen years if they receive full, regular servicing. In order to provide servicing for GE gas anesthesia machines, GE and ISOs must have timely and reliable access to GE parts and employ technicians

who have been specifically trained to service these machines. ISOs without access to GE parts or GE training cannot offer servicing of GE gas anesthesia machines.

36.     The market for servicing GE gas anesthesia machines is highly profitable. Budget constraints have forced users of anesthesia machines increasingly to maintain existing machines, rather than replace them. As a result, the Servicing Market has recently expanded in size.

37.     The jury in *Red Lion Medical Safety Inc.* heard and found an identical definition for the market for servicing GE gas anesthesia machines, and this definition was necessary to its decision. When judgment is entered following the retrial on damages, GE will be collaterally estopped from contesting the definition of the Servicing Market.

### D.  Relevant Geographic Market

38.     The Servicing Market is a national market. GE gas anesthesia machine operators can and do turn to providers nationwide for timely servicing because ISOs and GE are able to provide service far from their home offices by stationing technicians around the country at minimal cost. Both the ISOs and GE are able to provide those services nationwide.

39.     The Parts Market is a national market. GE parts are shipped to ISOs around the country in response to servicing requirements.

40.     The Training Market is a national market. ISOs' technicians travel around the country to attend GE's training courses at GE training facilities.

## VI.   GE'S MONOPOLY POWER IN THE PARTS MARKET AND TRAINING MARKET

### A.  GE Holds Monopoly Power in the Parts Market

41.     GE has the power to control prices or exclude competition in the Parts Market. GE controls nearly 100 percent of the supply of GE parts in the relevant market, and there are no reliable substitutes.

42.     There are high barriers to entry for potential entrants to the Parts Market. GE enjoys economies of scale and scope, exclusive dealing arrangements with suppliers, and GE patents on parts. Additionally, manufacturing of GE parts requires high technical expertise and a long lead-time to develop. Accordingly, ISOs are unable to enter the market due to these high barriers to entry.

43.     The jury in *Red Lion Medical Safety Inc.* found that GE has monopoly power in the Parts Market as defined. The jury heard and decided the identical issue and the finding of GE's monopoly power in the relevant market for GE parts was necessary to its decision. Following entry of judgment, GE will be collaterally estopped from contesting its monopoly power in the Parts Market.

**B.  GE Holds Monopoly Power in Training Market**

44.     GE has the power to control prices or exclude competition in the Training Market. GE controls nearly 100 percent of the supply of GE training courses in the relevant market and there are no reliable substitutes.

45.     There are high barriers to entry for potential entrants to the training market. As the manufacturer of its gas anesthesia machines, GE enjoys a substantial advantage in its knowledge of its own machines. The informational inequality between GE and its actual or potential competitors would require a substantial investment of time and money to overcome. Accordingly, ISOs cannot realistically enter the Training Market.

46.     The jury in *Red Lion Medical Safety Inc.* found that GE has monopoly power in the Training Market as defined. The jury heard and decided the identical issue and the finding of GE's monopoly power in the relevant market for GE training was necessary to its decision.

Following entry of judgment, GE will be collaterally estopped from contesting its monopoly power in the Training Market.

## VII.   EXCLUSIONARY CONDUCT

### A.  Collateral Estoppel

47.     The jury in *Red Lion Medical Safety Inc.* found that GE used its monopoly power in the GE parts and GE training markets to acquire and maintain a monopoly in the market for servicing GE gas anesthesia machines. The jury heard and decided the identical monopolization violation alleged herein, and its finding of the violation was necessary to its decision. When judgment is entered, GE will be collaterally estopped from contesting its violation of Section 2 of the Sherman Act.

### B.  GE's Use of Monopoly Power in Parts Market to Monopolize Servicing Market

48.     ISOs require timely and reliable access to GE parts in order to compete for the service of GE gas anesthesia machines. Since 2011 and through the present, GE has used its monopoly power in the parts market to cripple ISOs' access to the necessary GE parts.

49.     Following GE's appointment of Alpha Source in 2011, ISOs have been forced to purchase GE parts at highly increased, discriminatory prices. Alpha Source charges ISOs a premium price—approximately 18 to 20 percent above GE's published price list—for the same GE parts. Several ISOs have attempted to place orders directly with GE with no success.

50.     Additionally, Alpha Source does not keep a full stock of GE parts. If the part ordered is not in its stock and the part is needed overnight from GE, ISOs are forced to pay an enhanced price along with another flat fee of $1,000 for shipping per line item, regardless of the actual shipping cost. Because timely access to required parts is necessary for servicing, this lack of access has harmed ISOs' ability to provide the same quality of servicing as GE does.

11

51.     Prior to the Alpha Source appointment, ISOs were achieving double-digit growth in the Servicing Market. GE's decision to refuse to sell directly to ISOs was a direct response to ISOs' intrusion into GE's market share. Regarding the Alpha Source appointment, GE internally stated that the policy would "dis(enable)" ISOs by slowing down ISOs' fulfillment capability and adding to their costs.[3]

52.     Notably, GE's policy is limited to ISOs. GE has been selling the same parts to other entities who are not in competition with GE in the Servicing Market.

53.     GE changed its policy in order to hamstring ISOs' ability to compete in the Servicing Market. An email between GE executives discussing the Alpha Source appointment stated that as ISO "costs rise and their delivery slow[s], expect end user customers to choose GE."[4]

54.     GE has refused to provide legitimate economic or business justifications for its changed policies. GE has admitted that its changed policies did not save any warehousing space, logistics expense, or carrying costs.

55.     GE's policy is inconsistent with a profit-maximizing firm in the Parts Market absent desired effects in other markets. Since it began refusing to sell parts to ISOs, GE has sacrificed profits. Internally, GE stated that these reduced profits were "as hoped for the most part – flat with decline."[5] Meanwhile, Alpha Source grew an astounding 88 percent following its

---

[3] Memorandum Opinion and Order, *Red Lion Medical Safety, Inc. v. General Electric Company, et al.*, No. 2:15-cv-00308, at *19 (E.D. Tex., Mar. 30, 2018).

[4] *Id.*

[5] *Id.* at 22.

appointment in 2011 to 2015. GE admits that the result of the policy—sacrificing short-term profits in the parts market in exchange for "disenabl[ing]" ISOs—was what it "hoped for."[6]

56.     GE's refusal to deal with ISOs in the sale of its monopoly parts, after doing so for many years, illustrates GE's intent to exclude ISOs from the Servicing Market. Such refusal to deal is without legal justification, and was done to illegally leverage GE's monopoly in the Parts Market into the once-competitive Servicing Market by raising its rivals' costs. This decision and its own statements is evidence of GE's intent to forego present short-term profits in order to gain a long-term monopoly in the Servicing Market.

**C.   GE's Use of Monopoly Power in Training Market to Monopolize Servicing Market**

57.     GE took another step in 2014 to advance its goal of forcing ISOs out of the Servicing Market— it began restricting ISOs' access to necessary GE training courses.

58.     For nearly two decades prior to 2014, GE profitably sold GE training courses to its ISO competitors. Indeed, GE earned large profits—approximately 70 percent profit margin on sales—from its sales of GE training courses to ISOs. GE has admitted that it is "giving up the money it could be making by training as many third parties as it…possibly could" by engaging in the conduct alleged herein.[7]

59.     In 2013, GE closed its training facilities and did not train ISOs for nearly a year. In October 2014, GE announced it was reopening one of its training schools to ISOs at its Jupiter, Florida location. The reopening of the Jupiter facility was partnered with new, restrictive policies regarding ISO enrollment.

---

[6] Memorandum Opinion and Order, *Red Lion Medical Safety, Inc. v. General Electric Company, et al.*, No. 2:15-cv-00308, at *20 (E.D. Tex., Mar. 30, 2018).

[7] *Id.* at 24.

60.     On October 31, 2014, ISOs received a letter from GE that stated, repeatedly, that, with regard to the courses to be taught at Jupiter, Florida, "Scheduling, frequency, and location of courses will remain at GE Healthcare discretion." Relying on this policy, GE has consistently told ISOs that scheduled courses have been cancelled or overbooked, and that they were therefore unavailable.

61.     GE has also completely denied ISOs training for GE's newer, more technically-sophisticated GE machines. ISOs have made repeated requests to attend the relevant training schools for three newer GE machines (the Aespire, the Avance, and the Aisys). They have been denied access because this training is largely done at GE's Waukesha, Wisconsin location, which remains closed to ISOs.

62.     Furthermore, GE implemented two new conditions for ISOs seeking to apply for enrollment in training courses. First, the customer must list numerous competitively-sensitive details about its business. Through this requirement, GE has been able to assemble information about the ISOs' customers.

63.     Second, GE demanded that any ISO applying for a course provide a customer verification—on a form document prepared by GE—stating, "Your signature below verifies that the ISO individual seeking to register for a GE Healthcare clinical systems technical training class performs services on GE Healthcare equipment that is the subject of the requested class and does so **exclusively** at your site/network of sites." (emphasis in original). Of course, a customer cannot verify that the ISO will work on the customer's equipment **exclusively**, as customers know that ISOs have many customers. Thus, this required verification effectively precludes ISOs from enrolling in GE courses and thereby ensures that Plaintiffs and members of the class must employ GE technicians rather than ISOs because ISOs will not have had the requisite training.

Evidence presented at trial in *Red Lion Medical Safety Inc.* indicates that this customer endorsement policy was the final step in GE's scheme to "phase-out" third party training.[8]

64.    GE's refusal to enroll ISOs in necessary training illustrates GE's intent to exclude ISOs from the Servicing Market. Such refusal to deal is without legal justification and has been done to illegally leverage GE's monopoly in the Training Market into the once competitive Servicing Market by excluding ISOs from GE's essential facilities, the training schools, in order to gain a long-term monopoly in the Servicing Market.

## VIII.   THE EFFECTS ON COMPETITION AND ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

65.    GE's exclusionary conduct had the following effects, among others:

(a)    Competition in the Servicing Market has been restrained;

(b)    Plaintiff and members of the Class paid artificially inflated prices for servicing of GE gas anesthesia machines;

(c)    Plaintiff and the members of the Class who purchased servicing of GE gas anesthesia machines have been deprived of free and open competition; and

(d)    As a direct and proximate result of GE's unlawful conduct, Plaintiff and members of the Class have been injured in their business and property.

66.    GE has admitted that its changed policies in the Parts Market and the Training Market actually served to harm consumers, noting that there was nothing "procompetitive…about [GE] raising prices to one of [consumers'] low-cost providers."[9]

---

[8] Memorandum Opinion and Order, *Red Lion Medical Safety, Inc. v. General Electric Company, et al.*, No. 2:15-cv-00308, at *24 (E.D. Tex., Mar. 30, 2018).

[9] *Id.* at 21.

67. By reason of the alleged violations of the antitrust laws as described herein, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for servicing of GE gas anesthesia machines than they would have paid in the absence of the Defendants' illegal conduct, and, as a result, have suffered damages in an amount presently undetermined. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## IX.   **CLASS ACTION ALLEGATIONS**

68. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities who purchased servicing of GE gas
> anesthesia machines in the United States directly from GE during
> the Class Period, defined as April 2011 through the present.

69. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities.

70. The Class contains hundreds of members, as GE sold servicing of GE gas anesthesia machines to hundreds of hospitals, clinics, physician groups, and other health care providers who operate the machines in the United States during the Class Period. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable.

71. Plaintiff and all members of the Class are similarly affected by GE's wrongful conduct in that they paid artificially inflated prices for servicing of GE gas anesthesia machines purchased directly from the GE, and they challenge GE's conduct with respect to the Class as a whole.

72.     Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

73.     Plaintiff has retained able and experienced antitrust and class action litigators as its counsel. Plaintiff has no conflicts with other Class members and will fairly and adequately protect the interests of the Class.

74.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in GE's wrongful conduct.

75.     Questions of law and fact common to the Class include, but are not limited to:

(a)     Whether GE engaged in exclusionary conduct in the Parts Market and Training Market to eliminate competition in the Servicing Market in order to charge supracompetitive prices for servicing of GE gas anesthesia machines in the United States;

(b)     Whether Defendants violated Section 2 of the Sherman Act;

(c)     The nature and character of the acts performed by GE in furtherance of the exclusionary conduct;

(d)     The duration of the exclusionary conduct and the acts carried out by GE in furtherance of the conduct;

(e)     Whether the conduct of GE, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)     Whether Plaintiff and the Class had any reason to know or suspect GE's exclusionary conduct, or any means to discover the exclusionary conduct; and

(g)     The appropriate class-wide measure of damages for the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for GE.

77.     Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender.

78.     The Class is readily definable and is one for which records should exist in the files of Defendants.

79.     Injunctive relief is appropriate with respect to the Class as a whole, because GE has acted on grounds generally applicable to the Class.

80.     Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## X.     PLAINTIFF'S CLAIMS ARE TIMELY

81.     This Complaint alleges continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

82.     Each time GE abused its monopoly power in the Parts Market and Training Market by denying ISOs' access to necessary parts or training, GE undertook an overt act that has inflicted harm on Plaintiff and other members of the Class. GE has committed these acts from 2011 through the present.

83.     Because Defendants have engaged in a continuing course of conduct, Plaintiff's

claims are timely.

## XI.     CLAIM FOR RELIEF

### COUNT I

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Monopolization of the Servicing Market**

84.     Plaintiff repeats and re-alleges the allegations set forth above.

85.     GE has monopolized the relevant market for sale of servicing for GE gas

anesthesia machines as alleged.

86.     GE has used its monopoly power in the relevant markets for GE parts and GE

training to acquire and maintain monopoly power and monopoly pricing in the relevant market

for servicing of GE gas anesthesia machines.

87.     GE's exclusionary conduct resulted in artificially high or otherwise

supracompetitive prices charged by GE to Plaintiff and members of the Class for servicing of GE

gas anesthesia machines.

88.     Plaintiff and members of the Class had to pay more for servicing of GE gas

anesthesia machines than they otherwise would have paid in a competitive marketplace.

89.     As a direct and proximate result of GE's exclusionary conduct, Plaintiff and

members of the Class have been injured and financially damaged in the respective businesses

and property, in amounts that are presently undetermined. Plaintiff's injuries consist of paying

higher prices to purchase servicing of GE gas anesthesia machines than it would have paid

absent GE's conduct. Plaintiff's injuries are of the type the antitrust laws were designed to

prevent and flow from that which makes Defendants' conduct unlawful.

90.     Accordingly, Plaintiff and the Class seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

91.     In addition, Plaintiff and the Class seek injunctive relief enjoining GE from continuing to engage in the anticompetitive practices described in this Complaint.

## COUNT II

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Attempted Monopolization of the Servicing Market**

92.     Plaintiff repeats and re-alleges the allegations set forth above.

93.     GE specifically intended to monopolize the market for servicing of GE gas anesthesia machines.

94.      GE's anticompetitive conduct, which restrained trade and competition in the market for servicing of GE gas anesthesia machines, constitutes an improper attempt to use its monopoly power in the relevant markets for GE Parts and GE Training for the specific purpose of monopolizing the market for servicing of GE gas anesthesia machines..

95.     In furtherance of this attempt, GE has engaged in anticompetitive conduct, as alleged herein, to stifle competition in the market for servicing of GE gas anesthesia machines.

96.     GE's anticompetitive conduct has decreased price competition in the market for servicing of GE gas anesthesia machines and deprived purchasers of free choice. GE profited, and continues to profit, from its unlawful conduct to the detriment of purchasers.

97.     There are no legitimate business or pro-competitive justifications for GE's conduct, and any purported legitimate business justifications are mere pretexts. Even if any justifications exist, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

98.     If not enjoined, GE will continue to engage in anticompetitive conduct that will further injure Plaintiff and members of the Class and competition.

99.     Should GE continue its anticompetitive conduct, there is a dangerous probability that it will succeed in achieving monopoly power in the market for servicing of GE gas anesthesia machines.

100.    As a direct, substantial, proximate and immediate result of GE's attempt to monopolize the market for servicing of GE gas anesthesia machines, Plaintiff and members of the Class have been injured in their business, property, and trade in an amount to be established at trial.

## XII.   **DEMAND FOR JUDGMENT**

Accordingly, Plaintiff, on behalf of itself and the proposed Class, respectfully requests:

(A)     That the Court certify this lawsuit as a class action under Rule 23(a), (b)(2), (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as a class representative, and that Plaintiff's counsel be appointed as class counsel;

(B)     That the unlawful conduct alleged herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act;

(C)     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing the exclusionary conduct alleged in the Complaint;

(D)     That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

(E)     That the Court award Plaintiff and the Class their costs of suit, including

reasonable attorneys' fees and expenses, as provided by law; and

(F)     That the Court award such further and additional relief as the case may require

and the Court may deem just and proper under the circumstances.

## XIII.   <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.


March 14, 2019                          /s/ *Eric G. Penley*_____
                                        Daniel R. Sonneborn (BBO # 679229)
                                        Eric G. Penley (BBO # 678920)
                                        **PRETI FLAHERTY BELIVEAU & PACHIOS
                                        LLP**
                                        60 State Street, Suite 1100
                                        Boston, MA 02109
                                        Tel: (617) 226-3800
                                        Fax: (617) 226-3801
                                        dsonneborn@preti.com
                                        epenley@preti.com

                                        Gregory S. Asciolla
                                        Jay L. Himes
                                        Karin E. Garvey
                                        **LABATON SUCHAROW LLP**
                                        140 Broadway
                                        New York, NY 10005
                                        Tel: (212) 907-0700
                                        Fax: (212) 818-0477
                                        gasciolla@labaton.com
                                        jhimes@labaton.com
                                        kgarvey@labaton.com

Charles F. Barrett
Benjamin C. Aaron
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Tel: (615) 244-1713
Fax: (615) 726-0573
cbarrett@nealharwell.com
baaron@nealharwell.com

Robert C. King
**THE KING LAW FIRM, P.C.**
36 W. Claiborne Street
Monroeville, AL 36460
Tel: (251) 575-3434
Fax: (251) 575-3003
rcking@frontiernet.net

*Counsel for Plaintiff and the Proposed Class*